# In the United States Court of Federal Claims

No. 12-774C
(Filed:  June 5, 2015)

```
*************************************
XP VEHICLES, INC., and              *
LIMNIA, INC.,                       *
                                    *
                Plaintiffs,         *
                                    *
                                    *
                                    *
v.                                  *
                                    *
THE UNITED STATES,                  *
                                    *
                Defendant.          *
*************************************
```

RCFC 12(b)(1); RCFC 12(b)(6); Motion to
Dismiss; Subject Matter Jurisdiction; Failure
to State a Claim; Loan Program; Loan
Guarantee Program; Implied-in-Fact
Contract; Duty of Good Faith and Fair
Dealing; Implied Duty to Fairly Consider;
Oral Assurances; Promissory Estoppel;
Equitable Estoppel

Daniel Z. Epstein, Washington, DC, for plaintiffs.

Lisa L. Donahue, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

SWEENEY, Judge

Plaintiffs, XP Vehicles, Inc. ("XPV"), an advanced technology vehicle company, and Limnia, Inc. ("Limnia"), an advanced technology energy system company, are Silicon Valley-based innovative "green technology" sister companies that develop and produce advanced technology vehicles.  Plaintiffs allege that they each applied for a loan to the Advanced Technology Vehicle Manufacturing Loan Program ("ATVM loan program"), which is administered by the United States Department of Energy ("DOE").  In addition, Limnia alleges that it applied for a loan guarantee to the Section 1703 Loan Guarantee Program ("Section 1703 LGP"), which is also administered by the DOE.  According to plaintiffs, their respective meritorious applications ultimately were denied because of corrupt political influence.  Thus, plaintiffs contend, the DOE did not review their applications in good faith and in accordance with DOE regulations, policies, and promises, thereby breaching the parties' implied-in-fact contracts, and violating the DOE's duty of good faith and fair dealing.  Plaintiffs also argue that promissory estoppel provides another basis for their entitlement to money damages against the United States.  Defendant moves to dismiss plaintiffs' second amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").  For the reasons set forth below, the court grants defendant's motion.

# I.  BACKGROUND

## A.  ATVM Loan Program

This case concerns plaintiffs' respective applications to the ATVM loan program and Limnia's application for a loan guarantee to the Section 1703 LGP.[1]  The ATVM loan program was created by the Energy Independence and Security Act of 2007 ("EISA"), codified at 42 U.S.C. § 17013, to move the United States towards greater energy independence and security, among other goals.  Pub. L. No. 110-140, 121 Stat. 1492.  At the time that plaintiffs applied for ATVM loans, the DOE administered the program through Steven Chu, United States Secretary of Energy ("Secretary"); Lachlan Seward, Director of the Advanced Technologies Manufacturing Loan Program; and their respective staff, advisors, and consultants.  The pertinent portion of the EISA sets forth that

> [t]he Secretary shall provide facility funding awards . . . to automobile manufacturers, ultra efficient vehicle manufacturers, and component suppliers to pay not more than 30 percent of the cost of --
>
> (1) reequipping, expanding, or establishing a manufacturing facility in the United States to produce--
>
> (A) qualifying advanced technology vehicles;
>
> (B) qualifying components; or
>
> (C) ultra efficient vehicles; and
>
> (2) engineering integration performed in the United States of qualifying vehicles, ultra efficient vehicles, and qualifying components.

42 U.S.C. § 17013(b).  The EISA further states that the "Secretary shall carry out a program to provide a total of not more than $25[ billion] in loans to eligible individuals and entities (as determined by the Secretary) for the costs of [such] activities described" above.  Id. § 17013(d)(1).  The Secretary must select

> eligible projects to receive loans . . . in cases in which, as determined by the Secretary, the award recipient (A) is financially viable without the receipt of additional Federal funding associated with the proposed project; (B) will provide sufficient information . . . for the Secretary to ensure that the qualified investment is expended efficiently and effectively; and (C) has met such other criteria as may be established and published by the Secretary.

Id. § 17013(d)(3).

---

[1]  The court derives the facts in the "Background" section from the second amended complaint and exhibits attached thereto.

**B.  XPV's ATVM Loan Program Application**

On November 10, 2008, XPV applied for $40 million in ATVM loan program funds in order to mass produce an advanced technology, family-friendly SUV-style vehicle.  XPV's operations included potential manufacturing facilities located in Michigan, California, Nevada, and Utah.  XPV's team consisted of highly experienced industry sales executives, managers, designers, and aerospace industry professionals.  They designed XPV's vehicle to be affordable; to have a virtually unlimited range without requiring gasoline, a garage, or electrical cords for battery recharge; to have the ability to recharge rapidly; to be produced quickly and cheaply; and to be easily repaired.  One of XPV's key innovations was the use of polymer plastics and skinned, expanded foam pressure membranes to replace metal doors, body panels, hoods, and roofs on a lightweight alloy frame.  This design provided for a curb weight of less than 1,400 pounds, which, in addition to contributing to the vehicle's virtually unlimited range, was a "key innovation" in improving vehicle safety because the polymer membranes functioned as a wraparound, predeployed airbag. 2d Am. Compl. ¶ 16.  The vehicle's parts that were critical for performance had either been tested or used in industry-proven "off-the-shelf" applications, such as military applications, aerospace systems, and naval and homeland security deployments.  Id. ¶ 17.  At the time that it submitted its loan application, XPV was in discussions with private sources of capital, pending customers, and financial partners, and was preparing to commence production and sales.

The DOE stated that it would evaluate ATVM loan program applications on a "first in, first out" basis, treat all applicants fairly, and use objective published criteria when reviewing applications.  Id. ¶ 19.  In addition, the DOE promised to make funds available to qualified applicants as early as the end of December 2008, but by no later than January 2009.  On December 2, 2008, the DOE acknowledged receipt of XPV's application and requested additional information regarding the projected market use of XPV's vehicle.  2d Am. Compl., Ex. 1 at 2.  XPV provided this information, and on December 31, 2008, its application was deemed substantially complete.  XPV's application was among the first to be considered substantially complete by the DOE.  A representative from the DOE said that it would request additional information from XPV as needed.

The DOE's Microsoft Excel comparison matrices dated December 29, 2008, and March 2, 2009, placed XPV in the top five percent of all applicants.  Based on the DOE's representations, XPV believed that the review process would take only weeks to be completed.  When the process exceeded that time frame, XPV repeatedly offered the DOE additional engineering material, financial material, and other information to aid and expedite the DOE's review and approval of XPV's application.

On April 23, 2009, Jason Gerbsman, the DOE's Chief of Staff and Senior Investment Officer at the Loan Programs Office Automotive Division, sent XPV a letter advising:

> [XPV] has submitted a substantially complete application and has been assigned to both a technical eligibility and merit review team, as well as a financial viability analysis team.  The technical team is very close to finishing their evaluations on both eligibility and project merit, and the financial team will be launching a more detailed

3

and interactive due diligence phase of the [XPV] application review very soon. Following the technical and financial evaluation under the second stage of the process, we will move into the underwriting phase where our goal is to negotiate a conditional commitment, including a detailed term sheet.  This will be followed by the fourth phase of the loan process where the final details will be negotiated and the loan will be closed.

Id. ¶ 27.  On May 26, 2009, Mr. Gerbsman offered XPV an in-person meeting to discuss "next steps."  Id. ¶ 28.  On May 28, 2009, an XPV representative met with Mr. Gerbsman, who indicated that "everything was in order" with XPV's application, that "everything looked good," and that XPV "appeared to be fully compliant and passed [the] technical review."  Id. ¶ 29.

Shortly thereafter, XPV discovered that Tesla Motors, Inc. ("Tesla") and Fisker Motors, Inc. ("Fisker"), both competitors of XPV, were receiving assistance from the DOE's staff in connection with their respective ATVM loan program applications.  Fisker also received access to the DOE staff's time, offices, and conference rooms in the DOE's headquarters at no charge. Although XPV made a similar request for assistance from the DOE's staff, its request was denied because the DOE represented to XPV that its application was so good that special assistance was not needed.

To further support its application, on June 15, 2009, XPV informed the DOE that it was a semifinalist in Forbes's "America's Most Promising Companies List" for that year.  Later that month, an XPV corporate executive was contacted by a counterpart from another company that had also applied for DOE funds through the ATVM loan program.  The executive from the other company advised that he had been "screwed over" by the DOE, and wanted to know if others had similar experiences.  Id. ¶ 33.  He explained that his company experienced "bad dealings" with two specific individuals:  Matt Rogers, from McKinsey & Company, who was serving as a "stimulus advisor" to Secretary Chu; and Steven Spinner, a DOE loan program official.  Id. According to the executive, Mr. Spinner had a conflict of interest because he was a Tesla advisor and investor.  The executive claimed that Mr. Rogers and Mr. Spinner were playing favorites with government money.

On June 24, 2009, the DOE announced an award of $8 billion in ATVM loans, to be divided among Ford Motor Company ("Ford"), Nissan North America, Inc. ("Nissan"), and Tesla.  Of that amount, the DOE awarded Tesla a $465 million loan at a rate of 1.6%.  On June 29, 2009, XPV wrote to Mr. Gerbsman, requesting action on its application, and stating that other lenders were "hanging back" until after the DOE issued its term sheets.  Id. ¶ 36.  Over the next seven weeks, Mr. Gerbsman and other DOE representatives reassured XPV that "everything was fine," that "everything [wa]s on track," that XPV "appear[ed] to meet every criter[ion]" with respect to its ATVM loan program application, and that defendant "should be able to announce [a loan] any day now."  Id. ¶ 37.

On August 21, 2009, the DOE denied XPV's ATVM loan program application.  The DOE indicated that XPV's application was "determined to be eligible" based on the "evaluation criteria" in 10 C.F.R. § 611.103, but that the DOE was "not in a position to award every eligible application [for ATVM loan program funds]."  Id. ¶ 39.  The DOE further stated that necessity

required that it "choose applications that [we]re most likely to use proceeds in a way that w[ould] best achieve the goals of the program," and that XPV's application had been rejected on that basis after a "merit[s] review." Id. In an electronic-mail message to DOE employee Chris Foster, a subordinate of Mr. Seward, XPV requested the DOE's merit review documents. XPV also inquired how it was possible for a ten-month review of XPV's application to be considered "reasonable" without the DOE working with XPV's engineers or senior project staff members for "even one percent" of the time that the DOE's staff spent working on the proposals submitted by Tesla, Nissan, Ford, Fisker, or the other companies who were awarded ATVM loans. Id. ¶ 41. In XPV's view, XPV did not receive the same favorable treatment as did those applicants who were awarded loans. Mr. Foster did not respond to XPV's inquiry. Then, on or about August 26, 2009, an XPV representative called Mr. Foster, making the same inquiries as those set forth in XPV's electronic-mail message to which Mr. Foster did not respond. During that telephone conversation, Mr. Foster reviewed XPV's file, and advised that XPV's application was denied because: XPV's SUV did not use E85 gasoline; XPV was not planning on building "enough" vehicles; XPV was not planning on making government sales; XPV's electric motors and batteries were too futuristic and not developed for commercial use; XPV's SUV was a "hydrogen car"; and XPV had underestimated the cost of metal body fabrication. Id. ¶ 45.

After Mr. Foster related the DOE's analysis of XPV's vehicle's flaws, the XPV representative responded that the DOE's factual predicate for the denial of loans was inaccurate and lacked merit. During this latter portion of the telephone conversation, Mr. Seward entered Mr. Foster's office, directed him to terminate the call, and instructed Mr. Foster to advise XPV that it would receive a letter from the DOE responding to its concerns.[2] XPV did not receive a letter during the next few weeks. On September 21, 2009, XPV wrote to Secretary Chu, requesting reconsideration of the denial of its application. In its letter, XPV articulated its belief that the reasons offered by the DOE for the denial of its application were not legitimate. On October 23, 2009, Mr. Seward sent a letter to XPV, providing the DOE's explanation for the denial of XPV's loan application.

## C. Limnia's ATVM Loan Program Application

On or about February 1, 2009, Limnia applied for $15 million in ATVM loan program funds to produce a "best of breed and state of the art" advanced technology vehicle component energy storage system using Limnia's patented technology. Id. ¶ 69. The DOE's Sandia National Laboratories ("Sandia") was designated as one of its subcontractors. The DOE denied Limnia's application on April 10, 2009, stating that the components in question "[did] not appear to be designed for installation in an advanced technology vehicle . . . ." Id. ¶ 70. On April 11, 2009, Limnia requested reconsideration, contending that: the relevant patents stated that the components in question were meant for use in advanced technology vehicles; Sandia's vehicle technologies group was the prime subcontractor for the project; and that the DOE had funded the technology's development specifically for such use. On May 13, 2009, the DOE denied Limnia's application again, indicating that the components were "not installed in the advanced

---

[2] No information has been provided to the court regarding how Mr. Seward was alerted to the fact that Mr. Foster had been contacted by the XPV representative to complain about not being selected to receive ATVM loan program funds and to protest the bases for the DOE's rejection of XPV's loan application.

technology vehicle." Id. ¶ 72.  Additionally, the DOE requested more information, including anticipated production volumes, the specific advanced technology vehicle into which Limnia's product would be installed, and details regarding the vehicle installation process of the product. 2d Am. Compl., Ex. 8 at 1-2.  On June 3, 2009, Limnia complied.  Limnia also asked for reconsideration of its application, stating that the questioned components "must be installed prior to use in an advanced technology vehicle[, are] designed for such installation, and therefore [are] qualifying components."  2d Am. Compl. ¶ 72.  The DOE did not respond to that letter.

### D.  Section 1703 Loan Guarantee Program

In addition to the ATVM loan program, the DOE administers the Section 1703 LGP, which was created by the Energy Policy Act of 2005 ("Energy Policy Act").  42 U.S.C. §§ 16511-16516.  The Section 1703 LGP's purpose is to support innovative clean energy projects that are typically unable to obtain conventional private financing due to high technology risks.  The Energy Policy Act authorizes the DOE to guarantee up to 80% of a loan for projects that "(1) avoid, reduce, or sequester air pollutants or anthropogenic emissions of greenhouse gases; and (2) employ new or significantly improved technologies as compared to commercial technologies in service in the United States at the time the guarantee is issued."  Id. § 16513(a).  At the time of the filing of the second amended complaint, the "DOE ha[d] approximately $34 billion of unused lending authority" for the program.  2d Am. Compl. ¶ 12.  Congress provided criteria by which to evaluate eligible projects and set loan and repayment terms.  The DOE then promulgated rules and regulations fleshing out the Energy Policy Act's requirements.

### E.  Limnia's Section 1703 LGP Application

On or about February 1, 2009, Limnia participated in a conference call with Secretary Chu, United States Secretary of the Interior Kenneth Salazar, and John Podesta, a consultant retained by the DOE.  During that conference call, Secretary Chu said that he felt that the "[Section 1703] LGP fees and process were unduly onerous and burdensome[, and] promised to waive the application fee."  Id. ¶ 76.  On February 10, 2009, Limnia filed an application with the Section 1703 LGP, which included a cover letter stating that it was Limnia's understanding that the DOE had waived the application fee.  On February 26, 2009, the application deadline, Myrtle Gross, a DOE employee, called Limnia and stated that the initial application fee had not been waived, and that $18,000 had to be wired to the DOE by midnight in order for Limnia's Section 1703 LGP application to be considered.  This was Limnia's first and only notice that its application fee had not been waived.  Limnia possessed the funds to make the payment, but it could not complete the transaction by the midnight deadline.  Because it was unable to effectuate the wire transfer, Limnia assumed that it was foreclosed from submitting its application.  On February 27, 2009, Daniel Tobin, the DOE's Loan Programs Office Senior Investment Officer, called Limnia and said that there were "a few days of flexibility" to send in its application fee, and indicated that he would provide wire transmission instructions.  Id. ¶ 80.  Mr. Tobin also promised to "preview" Limnia's application and to provide feedback for its investors.  Id.  Over the next six weeks, Limnia contacted the DOE by sending electronic-mail messages and letters, seeking instructions regarding wiring the application fee.  Limnia received no response from anyone at the DOE regarding such instructions or the preview.  On April 9, 2009, the DOE dismissed Limnia from the Section 1703 LGP because of "non-remittance of the required

application fee . . . ." Id.  Although Limnia requested reconsideration of the DOE's decision, Limnia's request was denied.

**F. Procedural History**

Plaintiffs filed suit in the United States Court of Federal Claims ("Court of Federal Claims"), and then subsequently amended their complaint.  Thereafter, defendant filed a motion to dismiss, and plaintiffs amended their complaint for a second time.  After the filing of the second amended complaint, defendant filed the present motion to dismiss.  Plaintiffs set forth four claims for relief in their second amended complaint:  1) "Equitable Estoppel (ATVM Loan Program Applications)"; 2) "Promissory Estoppel (LGP Application)"; 3) "Implied-in-Fact Contract (Fair Review of ATVM Loan Program Applications)"; and 4) "Breach of the Duty of Good Faith and Fair Dealing (Implied-in-Fact Contract)."  Id. at 27-30.

Plaintiffs allege that the DOE extended favorable treatment and preferences to Tesla and others based on political influence.  In essence, plaintiffs claim that the criterion for awarding funds and loans under the programs was the pay-to-play rule of corrupt politics.  According to plaintiffs, awards were made only to those companies making monetary contributions to certain political campaigns.  Plaintiffs aver that "politics and pressure infected" the ATVM loan program and the Section 1703 LGP, id. ¶ 84, where the DOE "fixed [these programs] to protect and advance the business and political interests of government cronies," id. ¶ 117.  Plaintiffs contend that the DOE did not review their applications in good faith and in accordance with DOE regulations and policies, and that plaintiffs were improperly denied ATVM loan program and Section 1703 LGP funds.  Plaintiffs assert that the DOE's demonstrated political favoritism constituted a breach of implied-in-fact contracts with them, and that the DOE is estopped from denying that such contracts exist.  Further, plaintiffs contend that the DOE breached the implied duty of good faith and fair dealing harbored within the parties' implied-in-fact contracts.  Plaintiffs collectively request no less than $450 million in consequential and punitive damages, reimbursement of their respective application fees, damages for defendant's alleged breach of its duty to fairly consider their applications, final agency review of Limnia's Section 1703 LGP application on the merits, and actual costs and attorney's fees.  Defendant filed a motion to dismiss plaintiffs' claims pursuant to RCFC 12(b)(1) and RCFC 12(b)(6).  The motion has been fully briefed, and the court deems oral argument unnecessary.

**II.  LEGAL STANDARDS**

Defendant moves to dismiss plaintiffs' complaint pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction, and under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.  When considering a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), as with a motion to dismiss pursuant to RCFC 12(b)(6), the court accepts as true all undisputed factual allegations made by the nonmoving party, and draws all reasonable inferences from those facts in the nonmoving party's favor.  Westlands Water Dist. v. United States, 109 Fed. Cl. 177, 190 (2013).

## A.  RCFC 12(b)(1)

Whether the court has jurisdiction to decide the merits of a case is a threshold matter. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  "Without jurisdiction[,] the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The parties, or the court sua sponte, may challenge the existence of subject matter jurisdiction at any time. Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).  The plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  The plaintiff cannot rely solely on allegations in the complaint, but must bring forth relevant, adequate proof to establish jurisdiction.  See McNutt, 298 U.S. at 189.  Ultimately, if the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim.  Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); see also RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## B.  RCFC 12(b)(6)

A claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if it does not provide a basis for the court to grant relief.  Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy.").  A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6) tests the sufficiency of the complaint.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007); see also RhinoCorps Ltd. Co. v. United States, 87 Fed. Cl. 481, 492 (2009) ("A motion made under Rule 12(b)(6) challenges the legal theory of the complaint, not the sufficiency of any evidence that might be adduced.").  The United States Supreme Court ("Supreme Court") explained in Twombly the degree of specificity with which a plaintiff must plead facts sufficient to survive such a motion, stating that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  550 U.S. at 555 (citation omitted).  Although a complaint need not contain "detailed factual allegations," id. at 555, it should contain "enough facts to state a claim to relief that is plausible on its face," id. at 570; see also id. at 555 (noting that "factual allegations must be enough to raise a right to relief above the speculative level").  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp., 550 U.S. at 556).  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  Bell Atl. Corp., 550 U.S. at 546. Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).

### C.  Tucker Act

The ability of the Court of Federal Claims to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941).  A waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).  The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States not sounding in tort that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C. § 1491 (2012).  However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages."  United States v. Testan, 424 U.S. 392, 398 (1976).  Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States."  Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

### D.  Contract Claims Against the United States Arising Under the Tucker Act

As explained above, the Tucker Act waives the government's sovereign immunity from suit to allow, among other claims, claims against the United States founded on an express or implied contract with the United States.  For a plaintiff to maintain a claim for breach of contract under the Tucker Act, "there must be privity of contract between the plaintiff and the United States."  Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998); accord First Annapolis Bancorp, Inc. v. United States, 644 F.3d 1367, 1373 (Fed. Cir. 2011) ("A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim."); Flexfab v. United States, 424 F.3d 1254, 1265 (Fed. Cir. 2005) (noting that as a general rule, the "government consents to be sued only by those with whom it has privity of contract").  The parties to that contract must be the plaintiff and the defendant.  See Silverman v. United States, 679 F.2d 865, 870 (Ct. Cl. 1982).  "A lack of privity deprives this court of jurisdiction." Carter v. United States, 98 Fed. Cl. 632, 636 (2011).  There are some exceptions to this general rule.  See Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999); First Nelson Constr. Co. v. United States, 79 Fed. Cl. 81, 94-95 (2007).  These exceptions include suits by intended third-party beneficiaries, suits by subcontractors "by means of a pass-through suit when the prime contractor is liable to the subcontractor for the subcontractor's damages," and suits by government contract sureties "for funds improperly disbursed to a prime contractor."  Hartford, 194 F.3d at 1289; accord Alpine Cnty., Cal. v. United States, 417 F.3d 1366, 1368 (Fed. Cir. 2005).  "[T]he common thread that unites these exceptions is that the party standing outside of privity by contractual obligation stands in the shoes of a party within privity." Hartford, 194 F.3d at 1289.

In addition, an implied-in-fact contract is a "substitute[] for direct privity."  Carter, 98 Fed. Cl. at 636.  "An implied-in-fact contract requires a showing of the same contractual elements as an express contract."  Last Chance Mining Co. v. United States, 12 Cl. Ct. 551, 555 (1987), aff'd, 846 F.2d 77 (Fed. Cir. 1988).  When alleging that the federal government entered into a contract, a plaintiff must establish "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance[;] and (4) 'actual authority' on the part of the

government's representative to bind the government." <u>Schism v. United States</u>, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc); <u>accord</u> <u>Anderson v. United States</u>, 85 Fed. Cl. 532, 542 (2009); <u>Trauma Serv. Grp. v. United States</u>, 104 F.3d 1321, 1326 (Fed. Cir. 1997).  With respect to a representative's ability to bind the government, however, such created "approval must be within the approving official's authority in order to be operative." <u>New Am. Shipbuilders, Inc. v. United States</u>, 871 F.2d 1077, 1080 (Fed. Cir. 1989); <u>accord</u> <u>Trauma Serv. Grp.</u>, 104 F.3d at 1327 (stating that a plaintiff "must allege facts sufficient to show that the Government representative who entered into its alleged implied-in-fact contract was a contracting officer or had implied actual authority to bind the Government").  "An implied-in-fact contract is founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." <u>Maher v. United States</u>, 314 F.3d 600, 603 (Fed. Cir. 2002) (citing <u>Hercules v. United States</u>, 516 U.S. 417, 424 (1996) (citing <u>Balt. & Ohio R.R. Co. v. United States</u>, 261 U.S. 592, 597 (1923))).  Ultimately, "[a] court will not . . . imply an agreement between parties when there was none, nor can a court imply privity when there was no meeting of the minds between the particular parties." <u>Carter</u>, 98 Fed. Cl. at 636.

## III.  DISCUSSION

### A.  RCFC 12(b)(1)

#### 1.  Neither the EISA nor the Energy Policy Act Are Money-Mandating Statutes Within the Meaning of the Tucker Act and Therefore Cannot Confer Jurisdiction on This Court

Plaintiffs contend that this court possesses jurisdiction to entertain their claims regarding the denial of their respective applications to the ATVM loan program and Section 1703 LGP.  Pls.' Opp'n 3, 14-15.  However, plaintiffs fail to cite to a money-mandating statute or regulation that confers jurisdiction on this court.  The EISA and the Energy Policy Act created the ATVM loan program and the Section 1703 LGP, respectively.  <u>See</u> 42 U.S.C. §§ 17013, 16511-16516. Plaintiffs have failed to identify any provision of either statute that gives them a right of action to seek recovery of monetary damages in this court.  Indeed, none exist.  <u>See id.</u>  Moreover, a statute or regulation that creates a loan program or loan guarantee program is not assumed to be inherently money-mandating.  <u>See Anderson</u>, 85 Fed. Cl. at 542 (rejecting the plaintiff's argument that the general scheme of the agency's loan guarantee program was money-mandating).  Rather, such statutes or regulations must contain "a substantive right to monetary compensation . . . before jurisdiction may be established in this Court by virtue of the Tucker Act." <u>Campbell v. United States</u>, 16 Cl. Ct. 690, 696 (1989).  For this reason, the court lacks jurisdiction to entertain plaintiffs' claims pursuant to any statute or regulation that they have cited.  <u>Anderson</u>, 85 Fed. Cl. at 543 (determining that the court possessed no jurisdiction with respect to a denied loan guarantee program application because the statute that created the program was not money-mandating); <u>Campbell</u>, 16 Cl. Ct. at 696 (holding that the court lacked jurisdiction to hear the plaintiff's claims regarding a loan program application because nothing in the regulation that created the program was money-mandating, and that therefore, there was no waiver of sovereign immunity under the Tucker Act); <u>El Dorado Springs v. United States</u>, 28 Fed. Cl. 132, 136 (1993) (finding that the court lacked jurisdiction over the plaintiff's claims

regarding a mortgage insurance application to a federal agency because it did not invoke a money-mandating statute).

### 2. The Court Dismisses Plaintiffs' Second Claim for Relief, "Promissory Estoppel Claims (Limnia's Section 1703 LGP Application)"

In plaintiffs' second claim for relief, Limnia contends that the DOE promised that its Section 1703 LGP application fee would be waived.  According to plaintiffs, the "DOE recognized that the LGP application fees and process were unduly onerous and burdensome," 2d Am. Compl. ¶ 75, and Secretary Chu therefore "promised to waive [Limnia's] application fee," id. ¶ 76.  Consequently, on February 10, 2009, when Limnia filed its Section 1703 LGP application, its cover letter stated "[its] understanding [that the] DOE had waived the application fee."  Id. ¶ 77.  Limnia asserts that promissory estoppel lies against the government because Limnia was unaware that a filing fee was, in fact, required until the day of the filing deadline, when it was contacted by a DOE representative who advised that the initial application fee had to be wired by midnight in order for Limnia's application to be considered.  Id. ¶ 78.  Limnia also avers that once it was informed that it was required to pay the fee, the DOE then reneged on a subsequent promise that it would allow Limnia to send its application fee after the deadline had expired.  Id. ¶¶ 80-81.  Notwithstanding that the DOE advised that it would allow Limnia some flexibility in sending the application fee, the DOE failed to provide the wire instructions that it promised, and then dismissed Limnia from the Section 1703 LGP for failure to pay the application fee.  Id. ¶¶ 80, 132.  Limnia claims that it relied on the DOE's promises to waive the application fee and to provide additional time to send the application fee, and as a consequence, the DOE is estopped from refusing to accept Limnia's application.  Id. ¶ 134.

A claim for promissory estoppel arises when a promisor makes "a promise [that] the promisor should reasonably [have] expect[ed] to induce action or forbearance on the part of the promisee . . . and which d[id] induce such action or forbearance . . . ."  Restatement (Second) of Contracts § 90(1) (2012).  It is "essentially an equitable cause of action whereby one who reasonably relies on another's promise can subsequently require [him] to make good on his promise."  Carter, 98 Fed. Cl. at 638.  Promissory estoppel "is another name for an implied-in-law contract claim."  Id. (quoting Hubbs v. United States, 20 Cl. Ct. 423, 427 (1990)).  The court in Steinberg v. United States held that:

> In order to prevail on a claim of promissory estoppel, a party must prove[:] first, that there was a promise or representation made[;] second, that the promise or representation was relied upon by the party asserting the estoppel in such a manner as to change his position for the worse[;] and, third, that the promisee's reliance was reasonable and should have been reasonably expected by the promisor.

90 Fed. Cl. 435, 443 (2009) (citing Law Mathematics & Tech., Inc. v. United States, 779 F.2d 675, 678 (Fed. Cir. 1985)).  Once these elements are met, "the promise will be binding if justice so requires."  Id.  Further, "[d]etrimental reliance is [only] an element of a claim of promissory estoppel, a contract implied in law, [and] is not an element of a contract in fact."  Steinberg, 90 Fed. Cl. at 444.  "The distinction between 'implied in fact' and 'implied in law,' and the consequent limitation, is well established . . . ."  Hercules,

516 U.S. at 423.  An agreement implied in fact is "founded upon a meeting of minds, which," as described earlier, is inferred from the parties' conduct in light of the surrounding circumstances.  Id. (citation and internal quotation marks omitted).  "By contrast, an agreement implied in law is a 'fiction of law' where 'a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress.'"  Id. (quoting Balt. & Ohio R.R. Co., 261 U.S. at 597).  Simply put, the Tucker Act does not allow suits against the government based on contracts implied in law.  United States v. Mitchell, 463 U.S. 206, 218 (1983).

Here, Limnia asserts that it detrimentally relied on the DOE's assurance that its Section 1703 LGP application would be processed and considered without Limnia remitting the requisite fee.  2d Am. Compl. ¶¶ 130-31.  Limnia therefore asserts a promissory estoppel claim, or a claim for a contract implied in law.  Limnia's theory of liability has no legal validity in this court.  It is well settled that "[a]lthough the court's jurisdiction extends to implied contracts as well as express contracts, it can adjudicate only contracts implied in fact and not contracts implied in law."  Tree Farm Dev. Corp. v. United States, 585 F.2d 493, 498 (Ct. Cl. 1978) (citing United States v. Minn. Mutual Inv. Co., 271 U.S. 212, 217-18 (1926)).  Implied-in-law contracts are "claim[s] for which the United States has not waived its sovereign immunity."  Steinberg, 90 Fed. Cl. at 443 (citing Lion Raisins, Inc. v. United States, 54 Fed. Cl. 427, 431 (2002)); accord Hercules, 516 U.S. at 423 ("We have repeatedly held that [Tucker Act] jurisdiction extends only to contracts either express or implied in fact, and not to claims on contracts implied in law.");  Russell Corp. v. United States, 210 Ct. Cl. 596, 537 (1976) ("This court, of course[,] has no jurisdiction to render judgment against the United States based upon a contract implied in law.");  Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 111 (2012) ("Promissory estoppel theory does not fall within the jurisdiction granted to the court by the Tucker Act, and . . . the government has not waived its sovereign immunity with regard to a promissory estoppel cause of action." (citation and internal quotation marks omitted));  Calvin v. United States, 63 Fed. Cl. 468, 471 n.7 (2005);  Perpetual Fin. Corp. v. United States, 61 Fed. Cl. 126, 138-39 (2004).  Accordingly, this court lacks jurisdiction to hear Limnia's promissory estoppel claim.  Carter, 98 Fed. Cl. at 639 (dismissing the plaintiff's claim pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction, where the plaintiff "allege[d] that it relied to its detriment on the government's conduct and [wa]s thus entitled to monetary damages," because the court lacks jurisdiction over promissory estoppel claims);  Steinberg, 90 Fed. Cl. at 444 (holding that the court had no jurisdiction under RCFC 12(b)(1) to hear the plaintiff's claim because detrimental reliance is an element of promissory estoppel).  Consequently, the court dismisses without prejudice, for lack of jurisdiction, the second claim for relief in plaintiffs' second amended complaint.

### 3.  The Court Dismisses Plaintiffs' Purported Equitable Estoppel Claims in Their First Claim for Relief, "Equitable Estoppel Claims (ATVM Loan Program Applications)"

Plaintiffs aver in their first claim for relief that the DOE "was required to follow objective, published criteria in determining applicants' eligibility for receiving ATVM loans."  2d Am. Compl. ¶ 122.  Further, plaintiffs assert that the DOE "repeatedly acknowledged verbally and in writing" that plaintiffs "were qualified . . . applicants," and that plaintiffs "were treated accordingly by DOE staff responsible for administering" the program.  Id. ¶ 123.  According to

plaintiffs, the DOE "therefore formed an implied-in-fact contract with [plaintiffs] to remit ATVM [l]oan [p]rogram funds." Id. Plaintiffs contend that the DOE "reasonably expected and intended for [plaintiffs] to rely on these promises and to trust that [the] DOE would follow the law." Id. ¶ 124. Plaintiffs assert that they did "in fact d[o] so," by "expend[ing] substantial sums of money and thousands of hours of time in preparing the applications and negotiating with [the] DOE," followed by "submit[ing] applications in response to [the] DOE['s] solicitations, pa[ying] the requisite application fees, . . . hir[ing] workers," and "pursuing the loan in reliance on [the] DOE's verbal and written representations and on its obligation to fund all qualified applications up to the limit of its lending authority." Id. Plaintiffs contend that but for the DOE's "affirmative misconduct," their applications would have been funded. Id. ¶ 125. Consequently, plaintiffs aver, the DOE is "equitably estopped from denying the contract implied in fact that was created by its solicitations [and by plaintiffs' respective] ATVM applications." Id. ¶ 127. Plaintiffs also contend that defendant is "equitably estopped from using opaque and arbitrary 'merit review' criteria to deny [their] applications." Id. ¶ 128.

Plaintiffs' arguments, although labeled as "equitable estoppel" claims, are, in fact, "thinly veiled claim[s] for promissory estoppel." Carter, 98 Fed. Cl. at 638. The court "must [therefore] determine which type of estoppel is pled here, regardless of how it is labeled in the [second amended] complaint." Id. at 639. Equitable estoppel "is a judicial remedy by which a party may be precluded, by its own acts or omissions, from asserting a right to which it otherwise would have been entitled." Am. Airlines, Inc. v. United States, 77 Fed. Cl. 672, 679 (2007) (citations omitted). For example, "a party who acquiesced to certain conduct could not later claim that [that] conduct was wrongful." Carter, 98 Fed. Cl. at 638. By contrast, as described earlier, promissory estoppel is an "equitable cause of action" where one who "reasonably relies on another's promise can subsequently require [him] to make good on [that] promise." Id. In other words, "[p]romissory estoppel is used to create a cause of action, whereas equitable estoppel is used to bar a party from raising a defense or objection it otherwise would have, or from instituting an action which it is [otherwise] entitled to institute." Knaub v. United States, 22 Cl. Ct. 268, 276 (1991) (citation omitted). Ultimately, "promissory estoppel is a sword, and equitable estoppel is a shield." Id. Indeed, "th[is] court repeatedly has held that equitable estoppel is a defensive doctrine, not the basis of a cause of action." Lawndale Restoration Ltd. P'ship v. United States, 95 Fed. Cl. 498, 507 (2010).

Here, plaintiffs attempt to use promissory estoppel to create a cause of action where none exists. The gravamen of plaintiffs' putative equitable estoppel claim runs as follows: the DOE's conduct in advising them that their respective ATVM loan program applications had been reviewed and found to be "qualified" by the agency created an irrevocable, binding promise guaranteeing plaintiffs' entitlement to ATVM loans.[3] Plaintiffs assert that they relied to their

---

[3] The court notes that the only instance wherein plaintiffs allege that Limnia was a qualified ATVM loan program applicant is found in paragraph 123 of the second amended complaint. In that paragraph, plaintiffs contend that "[a]t all times relevant, as [the] DOE repeatedly acknowledged verbally and in writing, both XPV and Limnia were qualified ATVM applicants[,] and were treated accordingly by DOE staff responsible for administering the loan programs for a period of months," and that the "DOE therefore formed an implied in fact contract with XPV and Limnia to remit ATVM [l]oan [p]rogram funds." These two sentences

detriment on defendant's "promises" that plaintiffs were qualified applicants, and argue that defendant should be required to fulfill such promises and remit the ATVM loans. 2d Am. Compl. ¶ 124. As noted above, alleging detrimental reliance on a promise and contending that that promise should be enforced constitutes a promissory estoppel claim. Thus, "[r]egardless of how [plaintiffs] label[] the claim in the [second amended] complaint, this is a claim of promissory estoppel." Carter, 98 Fed. Cl. at 639. This court, as explained previously, lacks jurisdiction to entertain promissory estoppel claims. Accordingly, the court dismisses without prejudice, for lack of jurisdiction, the claims invoking "equitable estoppel" set forth in the first claim for relief in plaintiffs' second amended complaint.[4] See id. at 639 (dismissing the plaintiff's "equitable estoppel" claim because, despite its label, it was actually a promissory estoppel claim, as the plaintiff alleged that it relied to its detriment on the government's conduct).

## B. RCFC 12(b)(6)

### 1. No Implied-in-Fact Contracts Arose Between Plaintiffs and Defendant

In their first and third claims for relief, plaintiffs contend that this court possesses jurisdiction over their claims that are based on implied-in-fact contracts with the DOE. An implied-in-fact contract is one of the government's waivers of sovereign immunity under the Tucker Act, see Loveladies Harbor, Inc., 27 F.3d at 1554, and a plaintiff's allegation that one exists between itself and the United States "is enough to confer subject matter jurisdiction in this [c]ourt," Penn. Dep't of Pub. Welfare v. United States, 48 Fed. Cl. 785, 786 (2001) (noting that the "allegation in [the] complaint that [the] claim was based upon [the] contract was enough to confer subject matter jurisdiction in the Court of Federal Claims" (citing Trauma Serv. Grp., 104 F.3d at 1324)). Indeed, a claim does not fail for lack of jurisdiction merely because its success is doubtful. Bell v. Hood, 327 U.S. 678, 682 (1946). Rather, "[f]ailure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." Trauma Serv. Grp., 104 F.3d at 1324. Therefore, this court will address whether plaintiffs have stated a claim upon which relief can be granted.

### a. The Court Denies the Remaining Claims in Plaintiffs' First Claim for Relief

### i. Plaintiffs' ATVM Loan Program Applications Did Not Create a Contract to Remit Funds

In addition to the promissory estoppel claims set forth in plaintiffs' first claim for relief, plaintiffs' first claim also sets forth that the DOE was "obligated by statute to fund qualified applications up to the limit of its Congressional authorization," 2d Am. Compl. ¶ 120, and that the DOE was "required to follow objective . . . criteria in determining applicants' eligibility for receiving ATVM loans," id. ¶ 122. Plaintiffs thus claim that an "implied in fact [contract] was

---

stand in stark contrast to the detailed allegations set forth in the second amended complaint detailing XPV's application to the ATVM loan program and its interaction with the DOE.

[4] To the extent that plaintiffs raise other promissory estoppel claims with respect to the ATVM loan program, although not explicitly pled, those claims are denied for the same reasons.

created by [defendant's] solicitations." Id. ¶ 127.  Further, plaintiffs aver that they submitted applications and paid the corresponding application fees.  Id. ¶ 124.  Plaintiffs also assert that the DOE "acknowledged verbally and in writing" that they "were qualified . . . applicants," and that the DOE had an "obligation to fund all qualified applications up to the limit of its lending authority."  Id.  Based upon these allegations, plaintiffs claim that defendant "therefore formed an implied-in-fact contract with [each plaintiff] to remit ATVM [l]oan [p]rogram funds."  Id. ¶ 123.

As described earlier, when alleging that the federal government entered into an implied-in-fact contract, a plaintiff must establish the same elements as an express contract, namely: mutuality of intent to contract, an unambiguous offer and acceptance, consideration, and actual authority on the part of the government's representative to bind the government.  Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003); Schism, 316 F.3d at 1278.  Contrary to plaintiffs' assertion here, there is nothing inherent in an agency's invitation to the public to apply for a loan that constitutes an offer to contract, or that forms the basis for a contract once an application is submitted, even if the application criteria are ostensibly met.  It is well recognized that "mere solicitations, invitations[,] or instructions from the [g]overnment are not offers to contract that bind the [g]overnment upon [a] plaintiff's completion of a form, even when the solicitations, invitations or instructions are embodied in a statute or regulation."  Girling Health Sys., Inc. v. United States, 22 Cl. Ct. 66, 71-72 (1990); accord Tree Farm, 585 F.2d at 500 (explaining that "invitations by the [g]overnment to file applications do not necessarily equal an operative offer, the acceptance of which will result in a binding contract").

More specifically, a statute and regulation that create a loan guarantee program "cannot fairly be characterized as an offer to make loan guarantees to qualified applicants," but rather, "merely create a process for receiving and considering applications . . . ."  Baker v. United States, 50 Fed. Cl. at 489, 493 (2001).  In rejecting the argument that a mere application to a government loan program could result in a contract binding the government, the United States Court of Claims ("Court of Claims") explained that, with respect to a loan guarantee program, "it requires a distor[t]ion of plain English to infer that [a] plaintiff's making of an application in conformity with [the stated requirements] would constitute an acceptance of an offer whereby the [g]overnment intended to bind itself."  Tree Farm, 585 F.2d at 500.  Indeed, "[i]t would do violence to traditional contract theory, not to mention the operation of government, to hold that any statute requiring some action by a citizen to obtain a benefit or protect a right constituted an open offer to contract."  Last Chance Mining Co., 12 Cl. Ct. at 555-56.  The case now before the court is no exception—the lack of a formal government offer and acceptance, along with "the total absence of a meeting of the minds," demonstrates that no contract was formed.  Tree Farm, 585 F.2d at 501 (noting that "[s]ince there is no implied-in-fact contract on the facts of this case . . . the court [cannot] consider plaintiff's claim"); accord Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003) ("An implied-in-fact contract is one founded upon a meeting of minds and 'is inferred, as a fact, from [the] conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" (quoting Balt. & Ohio R.R. Co., 261 U.S. at 597)).  Further, because the pertinent statutes and regulations that created the respective loan and loan guarantee programs include evaluation criteria and specifically grant the DOE discretion in administering these programs, it is evident that the mere submission of completed paperwork for review and processing does not guarantee the grant of a loan or a loan guarantee.

Simply stated, any averments setting forth the elements necessary to prove the existence of a contract are absent from plaintiffs' second amended complaint.

### ii.  DOE Officials' Representations to Plaintiffs During the Application Stage Did Not Create a Binding Contract

Plaintiffs assert in their first claim for relief that DOE officials' representations regarding their respective ATVM loan program applications created implied-in-fact contracts. 2d Am. Compl. ¶ 123; see also Pls.' Opp'n 34-35.  Before completing their evaluation of plaintiffs' applications, DOE representatives stated that XPV was a "qualified applicant," 2d Am. Compl. ¶ 21; that "everything was fine"; that "everything [wa]s on track"; that XPV "appear[ed] to meet every criter[ion] with respect to its ATVM loan program application"; and that defendant "should be able to announce [a loan] any day now," id. ¶ 37 (internal quotation marks omitted). Plaintiffs also aver that "[a]t all times relevant, as [the] DOE repeatedly acknowledged verbally and in writing, both XPV and Limnia were qualified ATVM applicants[,] and were treated accordingly by DOE staff responsible for administering the loan programs for a period of months."[5]  Id. ¶ 123.  Plaintiffs contend that by making these representations, the DOE formed implied-in-fact contracts to remit ATVM loan program funds to them.  Id.

Plaintiffs' legal arguments are contrary to the binding precedent of the United States Court of Appeals for the Federal Circuit ("Federal Circuit").  As explained above, case law is clear that to establish the existence of an implied-in-fact contract, plaintiffs must demonstrate that all contractual elements are satisfied, including that the DOE officials with whom it communicated possessed actual authority to bind the government.  Anderson, 344 F.3d at 1353; Schism, 316 F.3d at 1278; New Am. Shipbuilders, Inc., 871 F.2d at 1080.  In plaintiffs' second amended complaint, they fail to allege the existence of an offer and acceptance demonstrating the parties' mutual intent to be bound, and there are no allegations describing a government official with the requisite authority entering into a contract with plaintiffs on behalf of the government.  Quite simply, the second amended complaint is devoid of the factual averments necessary to state a claim for an implied-in-fact contract.

Moreover, the Federal Circuit has instructed that "[o]ral assurances do not produce a contract implied-in-fact until all the steps have been taken that the agency procedure requires; until then, there is no intent to be bound."  New Am. Shipbuilders, Inc., 871 F.2d at 1080.  In addition, the ATVM loan program regulation specifically provides that the "DOE is not bound by oral representations made during the [a]pplication stage, or during any negotiation process." 10 C.F.R. § 611.105(b) (2008).  Thus, as the Federal Circuit has made clear, "[i]t is irrelevant if the oral assurances emanate from the very official who will have authority at the proper time[] to sign the contract or grant," because if the assurances are premature and "an approving official exceeds his authority, the government can disavow the official's words and is not bound by an implied contract."  New Am. Shipbuilders, Inc., 871 F.2d at 1080.  Accordingly, the DOE officials' statements regarding plaintiffs' respective applications did not execute a contract, as these representations were made during the application stage, well before the evaluation was

_____

[5]  As the court noted above, there is only one instance where plaintiffs allege that Limnia was a qualified ATVM loan program applicant.  See supra note 3.

even completed or an actual offer to contract was made.  The officials' purported "approval" was "legally ineffective and d[id] not bind the United States to an implied-in-fact contract or by estoppel," despite plaintiffs' claims that they relied on such oral representations.[6]  Id. at 1081.  Accordingly, the court denies with prejudice the remaining claims in the first claim for relief of plaintiffs' second amended complaint.

### b.  The Court Denies Plaintiffs' Third Claim for Relief, "Implied-in-Fact Contract (Fair Review of ATVM Loan Program Applications)"

### i.  Plaintiffs Have Failed to Establish That the EISA or 10 C.F.R. § 611.103 Created a Binding Contract That Included a Specific Term Requiring Defendant to Review Plaintiffs' ATVM Loan Program Applications Fairly

In their third claim for relief, plaintiffs allege that the DOE was obligated by contract to consider their loan applications fairly.  2d Am. Compl. ¶¶ 138, 141; Pls.' Opp'n 27-28.  According to plaintiffs, the EISA and 10 C.F.R. § 611.103 outlined objective criteria that the DOE was required to follow when making loan decisions.  2d Am. Compl. ¶ 8; Pls.' Opp'n 27-28.  Plaintiffs contend that the statute and the DOE regulation created a contractual obligation for defendant to follow such objective criteria, and that the DOE failed to do so.  2d Am. Compl. ¶¶ 118, 138, 141; Pls.' Opp'n 15, 27-28.

Plaintiffs' contentions are incorrect.  As a preliminary matter, a federal statute or regulation does not inherently create a contractual relationship between an individual and the United States.  See Martinez v. United States, 48 Fed. Cl. 851, 862-63 (2001) (holding that a federal regulation did not create privity of contract between the plaintiff and the government), aff'd, 281 F.3d 1376 (Fed. Cir. 2002); Schuerman v. United States, 30 Fed. Cl. 420, 427 (1994) (same).  Indeed, the Supreme Court "has maintained since clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights, but merely declares a policy to be pursued until the legislature shall ordain otherwise."  Nat'l R.R. Passenger Corp. v. Atchison, 470 U.S. 451, 465-66 (1985) (citation and internal quotation marks omitted).  As the Supreme Court has further explained, "[t]his well-established presumption is grounded in the elementary proposition that

---

[6]  XPV also relies on 10 C.F.R. § 609.10(b).  See Pls.' Opp'n 35.  That regulation states that the "DOE is not bound by oral representations made during the Pre–Application stage, [(]if Pre–Applications were solicited,[)] or Application stage, or during any negotiation process."  10 C.F.R. § 609.10(b).  XPV contends that because the DOE representatives' oral assurances were made before this regulation was promulgated on December 4, 2009, the regulation is not controlling.  Pls.' Opp'n 35.  However, XPV's argument is unavailing because 10 C.F.R. § 611.105(b)—which, as quoted above, provides that the DOE is not bound by oral representations made during the application stage—went into effect on November 12, 2008, before the DOE officials made their representations to plaintiffs in 2009.  See generally 10 C.F.R. § 611.105; 2d Am. Compl. ¶¶ 36-37.  Nonetheless, even if 10 C.F.R. § 611.105(a) was not in effect at the time that such statements were made to XPV, XPV's argument would still not be persuasive because, as noted earlier, the Federal Circuit has held that oral assurances do not create an implied-in-fact contract before the agency's procedure has been completed.

the principal function of the legislature is not to make contracts, but to make laws that establish the policy of the state." Id. at 466.  Thus, "the party asserting the creation of a contract must overcome this well-founded presumption and [courts are required to] proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation." Brooks v. Dunlop Mfg. Inc., 702 F.3d 624, 630-31 (Fed. Cir. 2012). In this case, the statute and regulation containing the criteria pursuant to which the DOE would evaluate applications did not create a contract.  Of significance is plaintiffs' failure to identify any language in the EISA or regulation that suggest contract formation.  Neither contains "words typically associated with contract formation, such as 'offer' or 'acceptance.'" Id. at 631.  Nor do plaintiffs cite to any legislative history of the EISA or provide any other evidence that Congress intended to contractually bind the DOE to any ATVM loan program applicant.

Further, as described earlier, the Supreme Court held in Testan that plaintiffs must either rely on a statute that specifically authorizes money damages, or sufficiently allege the existence of a contract.  424 U.S. at 400.  Here, plaintiffs merely allege that the EISA created the ATVM loan program, and that because misconduct occurred during the administration of that program, plaintiffs did not receive their loans.  Allegations of misconduct do not establish that a contract between the DOE and plaintiffs existed, nor breach thereof.[7]  If the court were to accept plaintiffs' argument that the statute concerning a loan program, standing alone, created a contract, then any disappointed qualified applicant could allege that the government owed them a duty or an obligation.  This rationale would render meaningless the Tucker Act's money-mandating requirement.  Indeed, it "would blur the distinction between a claim founded on a money-mandating statute or regulation and one founded on a contract with the United States." Baker, 50 Fed. Cl. at 489.  The Testan court specifically rejected the notion that "the violation of any statute or regulation relating to [a plaintiff's claims] automatically creates a cause of action against the United States for money damages." Id. at 489 n.4 ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim whether it be the Constitution, a statute, or a regulation does not create a cause of action for money damages unless . . . that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting 424 U.S. at 401-02) (internal citation omitted))).  Accordingly, "[t]he United States cannot be contractually bound merely by invoking [a] statute [or] regulation" that pertains to plaintiffs' claims. Id. at 489 (citing Merrick v. United States, 846 F.2d 725, 726 (Fed. Cir. 1988)).  "The rule in Testan . . . cannot be avoided simply by characterizing the applicable statute or regulation as creating an implied contract," id., which is precisely what plaintiffs are attempting to do here.

**ii.  Defendant Did Not Enter Into a "Garden-Variety" Implied-in-Fact Contract to Fairly Review Plaintiffs' ATVM Loan Program Applications**

In addition, Limnia asserts that although the "DOE denied [its ATVM loan program] application on the grounds that the components in question '[did] not appear to be designed for installation in an advance technology vehicle . . . [,]' these grounds were false and a mere pretext

---

[7]  In addition, such allegations of misconduct raise tort claims and criminal matters, subject areas beyond the scope of this court's jurisdiction and subject to dismissal pursuant to RCFC 12(b)(1).

to preserve ATVM [l]oan [p]rogram funds for government-favored companies and/or to protect those companies from competition." 2d Am. Compl. ¶ 70.  Limnia alleges that when it requested reconsideration of its application, id. ¶ 71, the DOE denied its application again, but then asked for "more information," id. ¶ 72.  According to Limnia, it "responded with the requested information" and "again requested reconsideration, pointing out that the questioned components . . . must be installed prior to use in an advance technology vehicle and are, accordingly, designed for such installation, and therefore [are] . . . 'qualifying components.'" Id. ¶ 138. Limnia states that the "DOE never responded to this letter." Id. ¶ 73.

Along similar lines, XPV avers that despite its ATVM loan program application being "qualified" to receive a loan, id. ¶ 21, its application was "'set aside' in favor of applications from politically-connected government cronies[,] and [the] DOE had 'fixed' the ATVM loan process to benefit political donors, cronies[,] and insiders," id. ¶ 24.  According to XPV, the "DOE's political leadership had no intention of approving [its] ATVM application under any circumstances . . . because XPV competed with politically favored insider and crony companies." Id. ¶ 25.

Plaintiffs thus explain in their third claim for relief that the "DOE agreed to provide a fair process and a level playing field among all applicants, whether they were politically connected and had made large campaign donations or not." Id. ¶ 138.  Plaintiffs assert that the DOE "breached its contractual obligations by denying [them a] fair opportunity and objective review." Id. ¶ 141.  The DOE did so, plaintiffs allege, by "skewing, manipulating[,] and fixing the ATVM [l]oan [p]rogram to benefit government favorites[,] . . . favoring political cronies over companies that did not make political contributions or have influential patrons with [political] connections," and thus "wrongly denying [plaintiffs'] applications." Id.  Plaintiffs contend that even if the statute did not create an implied-in-fact contract to consider their applications fairly, defendant "breached a garden-variety implied-in-fact contract to fairly and objectively review" plaintiffs' ATVM loan program applications.  Pls.' Opp'n 25.  Contrary to plaintiffs' assertions, however, "merely because [a defendant] was willing to consider [the] plaintiff[s'] application[s, it] d[oes] not mean that [it] was offering to contractually bind itself to make a disposition of the application[s] on the merits rather than in some other manner." Tree Farm, 585 F.2d at 501.  The DOE's administration of the ATVM loan program, which included accepting and evaluating applications, did not create a default binding contract of any kind.[8]

---

[8]  To the extent that plaintiffs' allegations that the DOE's decision to award loans was not merits-based, but rather based upon corrupt political consideration, i.e., which companies competing for the loans contributed the most amount of money to specific politicians, such allegations are beyond this court's jurisdiction because they constitute tort or criminal claims. Tort liability theories asserted against the government are ill-advised in this court because it "specifically lacks jurisdiction in cases sounding in tort." Tree Farm, 585 F.2d at 498; accord 28 U.S.C. § 1491(a)(1); Keene Corp. v. United States, 508 U.S. 200, 214 (1993); Jefferson v. United States, 104 Fed. Cl. 81, 89 (2012).  The mere labeling of a claim is not dispositive of the nature of a claim.  For example, the mere labeling of a tort claim as one sounding in contract cannot confer jurisdiction on the Court of Federal Claims.  It is well settled that this "'court lacks jurisdiction if the essence of the claim lies in tort.'" Flowers v. United States, 80 Fed. Cl. 201, 213 (2008) (quoting Cottrell v. United States, 42 Fed. Cl. 144, 149 (1998)).  It is equally well-settled law that this court lacks jurisdiction over claims arising under the criminal code. Joshua

### iii.  The Court's Bid Protest Jurisdiction Cannot Be Expanded to Encompass Plaintiffs' Loan Program Application Claims

Plaintiffs also rely on <u>Heyer Products v. United States</u>, a bid protest case in which the plaintiff, a bidder who had submitted a proposal and lost, protested the award of the contract to another bidder, claiming that the government had engaged in "discrimination and favoritism," or "bad faith." 140 F. Supp. 409, 410 (Ct. Cl. 1956). The <u>Heyer</u> court denied the defendant's motion to dismiss the plaintiff's complaint for failure to state a claim. <u>Id.</u> at 414. The court reasoned that if the plaintiff's "allegations [we]re true, [the defendant] practiced a fraud on [the] plaintiff and on all other innocent bidders[,] induc[ing] them to spend their money to prepare their bids on the false representation that their bids would be honestly considered." <u>Id.</u> at 413. The court stated that it was an "implied condition of the request for offers" that "each of [the bids] would be fairly considered," and that a bidder has the "right to have his bid honestly considered." <u>Id.</u> at 412-13.  The court thus held that the parties' "implied contract ha[d] been broken, and [that the] plaintiff [could] maintain an action for damages for its breach." <u>Id.</u>  Here, plaintiffs allege that the "DOE breached its contractual obligations by denying [plaintiffs] the fair opportunity and objective review that they had bargained for and [that the] DOE had agreed to provide . . . ." 2d Am. Compl. ¶ 141.  Plaintiffs further aver that defendant manipulated and fixed the ATVM loan program to benefit government favorites and also favored political cronies over companies—such as plaintiffs—who lacked political connections or failed to make political contributions. <u>Id.</u>  Based upon the reasoning in <u>Heyer</u>, plaintiffs argue that because the "ATVM and LG programs were operated like procurements," Pls.' Opp'n 21, the government's "implied

---

v. United States, 17 F.3d 378, 379-80 (Fed. Cir. 1994) (affirming that the Court of Federal Claims had "'no jurisdiction to adjudicate any claims whatsoever under the federal criminal code'"); <u>Kania v. United States</u>, 650 F.2d 264, 268 (Ct. Cl. 1981) (noting that "the role of the judiciary in the high function of enforcing and policing the criminal law is assigned to the courts of general jurisdiction and not to this court").

Moreover, reviewing an agency's decision to determine if misconduct or abuses occurred constitutes review pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (1994), an inquiry that is reserved exclusively for the district courts. <u>See</u> <u>Webster v. United States</u>, 90 Fed. Cl. 107, 121 (2009) (determining that the court could not hear plaintiff's claims regarding the agency's alleged "wrongful acts" to the extent that they sounded in tort and APA liability because such jurisdiction was reserved for the district courts); <u>Ashgar v. United States</u>, 23 Cl. Ct. 226, 230 (1991) (holding that the court had no "general review authority under the APA" to "review [an] agency's decision and procedures" when the plaintiff alleged that an agency had "violated its own internal regulations and procedures" because "such general review authority has been assigned to the district courts of the United States"). As the Federal Circuit has held, this court "lacks the general federal question jurisdiction of the district courts, which would allow it to review the agency's actions and to grant relief pursuant to the Administrative Procedure Act." <u>Crocker v. United States</u>, 125 F.3d 1475, 1476 (Fed. Cir. 1997); <u>accord</u> <u>Lion Raisins, Inc. v. United States</u>, 416 F.3d 1356, 1370 n.11 (Fed. Cir. 2005) ("Of course, no APA review is available in the Court of Federal Claims."). The court is not bound by plaintiffs' labeling of a claim. Their challenge to the DOE's administration of its loan and loan guarantee programs raises tort, criminal, and APA claims. The court lacks jurisdiction over tort, criminal, and APA claims, and such claims are therefore dismissed pursuant to RCFC 12(b)(1).

contractual duty to fairly consider" bids applies here, as well, id. at 17. Plaintiffs' factual predicate is incorrect—this case does not arise under this court's bid protest jurisdiction; consequently, plaintiffs' arguments are not persuasive.

The Tucker Act establishes the court's bid protest jurisdiction, providing it with authority to hear "an action by an interested party objecting to a solicitation by a [f]ederal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The Federal Circuit has stated that a procurement "includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1244 (Fed. Cir. 2010); 41 U.S.C. § 111 (2012). In this case, the ATVM loan program and the Section 1703 LGP did not involve a procurement, nor operate like one, as plaintiffs assert. Plaintiffs did not respond to a government solicitation for bids or proposals to acquire goods or services. Instead, plaintiffs applied for loans and a loan guarantee, respectively, pursuant to statutes and regulations. No solicitations, bids, or contracts for goods or services were involved. Thus, the Heyer court's ruling that bids should be considered on the merits does not apply to plaintiffs' claims because their ATVM loan program and Section 1703 LGP applications seeking loans and a loan guarantee from the government, respectively, were entirely distinct from procurements for goods or services. Indeed, the Court of Claims held in binding precedent in Tree Farm that the plaintiff's application for a loan guarantee in that case "f[ell] outside of the ambit of Heyer and its progeny." 585 F.2d at 498. The court explained that because the "plaintiff [wa]s not a disappointed bidder, but merely an applicant seeking governmental guarantees of the financing for its proposed development, it [wa]s manifest that plaintiff d[id] not fall within the established parameters of the Heyer principles." Id. at 499.

Plaintiffs attempt to distinguish the facts presented in their case from those in Tree Farm to argue that the Tree Farm holding does not apply. Pls.' Opp'n at 19. Specifically, plaintiffs assert that Tree Farm did not involve favoritism, whereas Heyer did. Id. Plaintiffs contend that for that reason, the Heyer decision is apt, while the holding in Tree Farm declining to extend Heyer has no application. Id. Plaintiffs' argument is unconvincing. The Tree Farm court's basis for declining to extend Heyer's implied duty of fair consideration was that Tree Farm involved a loan guarantee application, not a disappointed bidder in a procurement. 585 F.2d at 499. Consequently, the court in Tree Farm refused to extend the Heyer implied duty to the loan guarantee context. Id. The Tree Farm court also noted that in Heyer, the plaintiff alleged that the agency had engaged in preferential treatment when awarding the contract, whereas in Tree Farm, there were no allegations of bad faith. Id. The Tree Farm court explained, however, that this distinction was merely an additional consideration when it declined to extend the Heyer rule to a loan guarantee setting, rather than being the central reason. Id. Thus, because the Tree Farm court concluded that there was no implied duty of fair consideration in the loan guarantee context, as no procurement was involved, its holding is salient here. Accordingly, because this case does not concern a procurement, plaintiffs cannot invoke Heyer's implied duty of fair consideration to create an implied-in-fact contract in connection with their respective loan and loan guarantee applications. See Baker, 50 Fed. Cl. at 498 (declining to extend Heyer to the plaintiff's loan guarantee application, and thus finding no implied-in-fact contract); N. Indian

Hous. & Dev. Council v. United States, 12 Cl. Ct. 417, 423 (1987) (holding that, as in Tree Farm, the plaintiffs did not fall "within the parameter of the Heyer principles because they were not disappointed bidders," thereby barring the court from hearing the plaintiffs' claims).

Plaintiffs also argue that the Heyer doctrine has been extended to cases outside of the procurement or competitive bidding context, and should thus be extended to their claims, as well. Pls.' Opp'n at 19-20. However, the decisions upon which plaintiffs rely are inapposite because those cases arise from government procurements. See, e.g., Refine Constr. Co. v. United States, 12 Cl. Ct. 56, 62 (1987) (describing a case in which the government agency reviewed the plaintiff's bid during a sole source procurement in order to award a contract for construction services); Acrow Corp. of Am. v. United States, 97 Fed. Cl. 161, 167 (2011) (describing a case in which the Army issued a solicitation to award a contract for construction services, bids were submitted, and the plaintiff brought a bid protest action). Moreover, in Tree Farm, the Court of Claims expressly addressed and rejected the argument that plaintiffs raise in this litigation, namely, that Heyer extends beyond procurements. In Tree Farm, the court explained that in Keco Industries v. United States, 428 F.2d 1233 (1970), it held that "the Heyer rule extended to all procurement situations." Tree Farm, 585 F.2d at 499. The Tree Farm court stated, "[w]e emphasize the words 'all procurement situations' because Heyer, even as clarified by Keco Industries, has not been extended beyond the disappointed bidder fact pattern," and "[t]he limited scope of Heyer is manifest in our [other] h[o]ldings[,]" as well. Id. Thus, in Tree Farm, the Court of Claims explicitly refused to extend its holding in Heyer beyond the procurement setting, and this remains binding precedent. Accordingly, this court, like all other courts that have been invited by parties to depart from this binding precedent and extend the Heyer rule, declines to extend Heyer. See New Am. Shipbuilders, 871 F.2d at 1080 (citing Tree Farm in refusing to "extend[]" the Heyer rule "requiring fair consideration of a bid[] for a contract of competitive bid procurement" to the plaintiff's objection to not receiving a federal grant, where the plaintiff was negotiating with the government to provide construction services); Baker, 50 Fed. Cl. at 497-98 (holding that it would "follow[] Tree Farm" in "declin[ing] to extend Heyer" beyond the procurement context to a loan guarantee application); El Dorado, 28 Fed. Cl. at 136-37 (discussing Tree Farm when "declin[ing]" to extend the Heyer rule "outside of the procurement setting," and thus rejecting the plaintiff's argument that it "could have an implied contract with the government to consider its application in good faith").

In addition, plaintiffs rely on Resource Conservation Group, a case in which the Navy issued a solicitation for proposals to lease its property. 597 F.3d at 1240. In that case, the Federal Circuit explained that this court's "implied-in-fact jurisdiction over nonprocurement solicitations survived the enactment of [28 U.S.C. § ]1491(b)(1)." Id. at 1245 n.11. In the case at bar, plaintiffs claim that that statement should be interpreted as expanding this court's jurisdiction to nonprocurement solicitations. Pls.' Opp'n 20-21. Plaintiffs are mistaken. The Federal Circuit made that statement in Resource Conservation Group while discussing the enactment of 28 U.S.C. § 1491(b)(1) and the change that it brought about. 597 F.3d at 1243-46. Specifically, the court described how previously, bid protest jurisdiction was shared by this court and the federal district courts, and how the introduction of section 1491(b)(1) placed that jurisdiction exclusively with this court. Id. at 1243. The court also indicated that "[b]efore [the] enactment of section 1491(b)(1), the Court of Federal Claims exercised jurisdiction over solicitations for the sale of government property, just as it did in the procurement area." Id. at

1245-46.  Referring to this court's jurisdiction over solicitations for the sale of government property, the court stated that "[t]he new statute on its face does not repeal the earlier jurisdiction."  Id. at 1246.  The court explained that "Congress intended the 1491(b)(1) jurisdiction to be exclusive [of the district courts] where 1491(b)(1) provided a remedy (in procurement cases) . . . [but] it seems quite unlikely that Congress would intend that statute to deny a pre-existing remedy without providing a remedy under the new statute."  Id.

Subsequently, the Federal Circuit held, "Congress did not intend to alter or restrict the Court of Federal Claims' existing jurisdiction in cases not covered by the new statute. . . . We conclude that the court's implied-in-fact jurisdiction over non-procurement solicitations survived the enactment of 1491(b)(1)."  Id.  Thus, instead of extending this court's jurisdiction to nonprocurement solicitations, as plaintiffs erroneously claim, the Federal Circuit merely confirmed the contours of the court's existing jurisdiction over solicitations for the sale of government property that was present prior to the enactment of section 1491(b)(1).  Moreover, it appears that the Federal Circuit's ruling was a narrow ruling regarding jurisdiction over the sale of government property; nothing indicates that it applies to an application for a loan or loan guarantee.  Consequently, the implied duty of fair consideration that Heyer laid out does not apply to plaintiffs' nonprocurement loan and loan guarantee application claims.  The court thus denies with prejudice the remaining implied-in-fact contract claims in the third claim for relief of plaintiffs' second amended complaint.[9]

---

[9]   Moreover, the mere fact that a company can manufacture or produce a quality product does not automatically entitle that company to an award under a government loan program.  Plaintiffs have not pointed to any statute or regulation that compels the DOE to provide plaintiffs with a detailed explanation for its decision to select other applications for the award of loans or loan guarantees under the ATVM loan program and the Section 1703 LGP, respectively.  In essence, plaintiffs seek a detailed debriefing with an explication and justification by the DOE for its decision to select other companies to participate in the ATVM loan program and the Section 1703 LGP.  The DOE is under no such obligation.  Indeed, plaintiffs' failure to receive a loan award is not, in itself, evidence that the loan and loan guarantee programs were not properly administered; requesting review of the agency's decision-making process constitutes an APA inquiry, which, as described earlier, is beyond this court's jurisdiction.  See Califano v. Sanders, 430 U.S. 99, 105 (1977) ("[T]he APA is not to be interpreted as an implied grant of subject-matter jurisdiction to review agency actions . . . ") Union Bank & Trust Co. v. United States, 27 Fed. Cl. 403, 404 (1992) (stating that the APA "provides for judicial review of an agency decision that is arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence, or unwarranted by the facts," and that it "does not establish jurisdiction in this court over claims for money" damages, thus barring this court from reviewing agency decisions "using APA standards"), aff'd, 6 F.3d 788 (Fed. Cir. 1993).  However, as plaintiffs have likened their claims to bid protest claims, the court notes the well-settled law that government contract officials are presumed to "exercise their duties in good faith."  Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002).  A protestor seeking to overcome this "strong presumption" bears a heavy burden of proof.  Id. at 1238-39.  Consequently, where, as here, there is no regulation requiring the DOE to provide an explanation for its decision, the presumption of regularity renders an explanation unnecessary "unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious."

**2. The Court Denies Plaintiffs' Fourth Claim for Relief, "Breach of the Duty of Good Faith and Fair Dealing (Implied-in-Fact Contract)"**

Plaintiffs further contend that their purported implied-in-fact contract with defendant to conduct a "fair and level review of their ATVM [l]oan [p]rogram applications . . . contained an implied duty of good faith and fair dealing obligating the parties not to do anything which would have the effect of destroying or injuring the right of the other to receive the fruits of its contractual bargain." 2d Am. Compl. ¶ 144.  However, as defendant has rightly noted, Def.'s Mot. 25, "the existence of th[e] covenant [of good faith and fair dealing] depends on the existence of an underlying contractual relationship . . . ."  Scott Timber Co. v. United States, 692 F.3d 1365, 1372 (Fed. Cir. 2012); accord Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 830 (Fed. Cir. 2010).  As explained herein, no contract was ever formed between plaintiffs and the DOE; consequently, the duty of good faith and fair dealing did not attach. Scott Timber Co., 692 F.3d at 1372 (noting that "there is no claim for a breach of th[e] covenant [of good faith and fair dealing] where a valid contract has not yet been formed"); Westlands Water Dist., 109 Fed. Cl. at 205 (". . . [P]laintiff has failed to show a contractual duty . . . or any implied contract . . . .  Therefore, there is no contractual . . . duty to which the implied duty of good faith and fair dealing can attach.").  Accordingly, the court denies with prejudice the fourth claim for relief of plaintiffs' second amended complaint.

## IV.  CONCLUSION

Plaintiffs do not invoke a money-mandating constitutional provision, federal statute, or regulation that confers jurisdiction on this court.  The court also lacks jurisdiction over plaintiffs' promissory estoppel claims.[10]  In addition, plaintiffs fail to state a claim upon which relief could be granted for any implied-in-fact contract with defendant.  The court is not bound to accept plaintiffs' legal arguments concerning the effect of their respective applications to the ATVM loan program and the Section 1703 LGP.  Consequently, because no contract has been properly alleged, there is no duty of good faith and fair dealing that attaches to defendant.[11]

---

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1338 (Fed. Cir. 2001)

[10]  In their prayer for relief, plaintiffs request, inter alia, an award of punitive damages. However, it is well settled that the court lacks jurisdiction to award punitive damages against the United States.  Garner v. United States, 230 Ct. Cl. 941, 941 (1982); Schortmann v. United States, 82 Fed. Cl. 1, 3 (2008) (noting the court's earlier dismissal of that portion of the plaintiffs' complaint requesting punitive damages because such relief is not available in the Court of Federal Claims); Greene v. United States, 65 Fed. Cl. 375, 379 (2005); Fields v. United States, 53 Fed. Cl. 412, 420 (2002); Christos v. United States, 48 Fed. Cl. 469, 478 n.22 (2000); Cooper v. United States, 47 Fed. Cl. 115, 117 (2000).

[11]  To the extent that plaintiffs raise other arguments in defense of their assertion of jurisdiction or in an attempt to state a claim upon which the court could grant relief, such arguments are summarily denied as lacking merit.  Additionally, the court need not reach such other grounds that defendant has proffered for dismissing plaintiffs' claims.  Finally, the court does not need to address the issue of whether transfer to the district court is appropriate.  On January 10,

Accordingly, the court **GRANTS** defendant's RCFC 12(b)(1) motion to dismiss for lack of subject matter jurisdiction with respect to plaintiffs' promissory estoppel claims, and **GRANTS** defendant's RCFC 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted as to plaintiffs' remaining claims.  Plaintiffs' second amended complaint is **DISMISSED**.  No costs.  The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

2013, plaintiffs filed a complaint raising similar allegations in the United States District Court for the District of Columbia, No. 13-cv-37 (D.D.C. Jan. 10, 2013).